IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA18-1177

Filed: 7 July 2020

Carteret County, No. 15CVD111

KARLA DUNN and RONALD DUNN, Plaintiffs,

v.

KEIR COVINGTON and COURTNEY COLE, Defendants,

PATRICIA ANNE SCHWEISTHAL and THOMAS B. SCHWEISTHAL, Intervenors.

Appeal by Courtney Cole from an order and judgment entered 29 January 2018 by Judge Peter Mack, Jr. in District Court, Carteret County. Heard in the Court of Appeals 1 October 2019.

*Michael Lincoln, P.A., by Michael Lincoln, for Plaintiff-Appellees.*

*Ward, Smith & Norris, P.A., by Kirby H. Smith, III, for Defendant-Appellant.*

McGEE, Chief Judge.

Courtney Cole ("Defendant" or "Ms. Cole") appeals a final order and judgment awarding full custody of her daughter to Karla Dunn and Ronald Dunn ("Plaintiffs" or "Dunns"), the child's paternal grandparents.

I.      Factual and Procedural Background

Ms. Cole is the mother and Keir Covington ("Mr. Covington") is the father of Tracy. Ms. Cole was born in Arizona to Thomas and Patricia Schweisthal ("the

Schweisthals"), who still live there. Ms. Cole met Mr. Covington in 2011 and, on 9 October 2012, she gave birth to Tracy in Phoenix, Arizona. Mr. Covington is the son of the Dunns, who reside in Emerald Isle, North Carolina.

Ms. Cole was charged with conspiring to sell firearms without a license in federal court on 27 August 2013, based on an incident that occurred in 2009. As a result of the charge, Ms. Cole was fired from her job. Consequently, she lost her house to foreclosure. While awaiting sentencing, Ms. Cole, Mr. Covington, and Tracy moved into an extended stay motel for about three weeks or a month because, as Ms. Cole testified, "[they] didn't want to sign a lease . . . if [she] was going to be sentenced to prison." Ms. Cole was convicted and sentenced to four years of probation, with six months on house arrest, on 28 March 2014.

After Ms. Cole was sentenced, she asked her parents, the Schweisthals, if she, Mr. Covington, and Tracy could move into their home in Arizona. The Schweisthals agreed Ms. Cole and Tracy could reside with them, but refused to allow Mr. Covington to do so. Ms. Cole testified she had a conversation with Ms. Dunn about moving to North Carolina and testified "[the Dunns] offered to . . . help . . . us to get our feet on the ground . . . ." Mr. Covington testified the Dunns "[o]ffered [him and Ms. Cole] a place to stay and then they came and helped us move." Ms. Dunn testified Ms. Cole and Mr. Covington had moved into the Dunns' residence in Emerald Isle by May 2014.

Ms. Cole testified that she began looking for a job once she moved to North Carolina. Ms. Dunn testified Ms. Cole worked cleaning vacation condos for about six weeks from June to July 2014. Ms. Cole testified that two weeks after moving to Emerald Isle, she got a job at Emerald Grill, a restaurant on the island. Ms. Cole testified that, after realizing wages were being withheld unfairly, she began looking for other employment. She looked for another job and soon started working at Santorini's Grill in Swansboro, North Carolina. Ms. Cole stayed at that job from July to late October 2014. Ms. Dunn testified Ms. Cole also worked at a diner called Mike's during this time. Ms. Cole chose to leave food service to seek a more permanent job in the medical field, her profession, and she testified she got a job at an Urgent Care in Jacksonville, North Carolina, and started working there around the end of December 2014. However, after Ms. Cole learned she would have a background check, she revealed her felony conviction to her employer and was terminated from that job after working there for about two and a half weeks.

The Dunns filed a complaint against Ms. Cole and Mr. Covington seeking custody of Tracy on 29 January 2015. They also moved for and obtained an *ex parte* emergency custody order entered the same day. The complaint was served on Ms. Cole by the Carteret County Sheriff's Department on 30 January 2015. In the complaint, the Dunns alleged Ms. Cole was a felon "convicted . . . for selling guns to Mexican Drug Cartel members"; "is also a drug addict and an alcoholic"; she was

taking a list of seven prescribed medications "but not as prescribed for the most part and supplements them with extra drugs . . ."; she "is not a fit parent, in that she has been unable and unwilling to be the caretaker of the minor child, and upon information and belief, she has expressed a desire to terminate her own life"; and she and Mr. Covington "have not acted, nor are they now acting, consistent with their Constitutional rights as biological parents, in that they have deferred the care and support of the minor child to the Plaintiffs." The Dunns further allege "[they] are preparing to evict [Ms.] Cole because she has made no effort to become gainfully employed or to substantially participate in the care of her daughter." The *ex parte* emergency custody order merely incorporated the Dunns' allegations as findings of fact.

Ms. Cole testified she did not learn the Dunns were seeking custody of Tracy until the complaint and the *ex parte* emergency custody order were served on her. Once the custody order was obtained and served, the Dunns asked Ms. Cole to move out of the house. Ms. Dunn testified Ms. Cole moved out "in the middle of February [2015]" when the Dunns "asked her to leave." Ms. Cole, however, testified the Dunns "didn't . . . verbally tell [her] . . . themselves'—that she "read it on the paper [(i.e., the complaint)] that they wanted [her] out." She testified "as soon as [she] read the Order . . . [she] was fairly upset about it[,]" and she packed up her things and moved in with a friend who she had worked with at Santorini's, who had an extra room in

the house where she and her husband lived "on base" in Jacksonville. She soon moved into an extended stay motel room in Jacksonville with money from jobs she was working at Golden Corral and Crystal Coast Retina Center.

A hearing was held on 9 March 2015 before Judge Peter Mack, Jr. on whether to grant a temporary custody order in the case. The trial court concluded that Ms. Cole "is an unfit person to have the care, custody and control of the minor child," although the court did not specify which facts supported that conclusion, nor did it indicate the standard of proof by which it found those facts. The trial court awarded temporary custody of Tracy to the Dunns but did not find that Mr. Covington, Tracy's other natural parent, was unfit or had otherwise acted inconsistent with his constitutionally-protected status.[1] The trial court also provided for visitation with Tracy by Ms. Cole and Mr. Covington, "at such times and under such circumstances as set out in a consent agreement between ALL the parties." Ms. Cole filed an answer to the Dunns' complaint and a counterclaim seeking temporary and permanent custody of Tracy on 31 March 2015, to which the Dunns filed a reply on 6 May 2015.

---

[1] Unlike Ms. Cole, the trial court did not find that Mr. Covington was unfit or acted inconsistent with his constitutionally-protected status as parent to Tracy in the temporary custody order. Instead, the trial court concluded in the order that "it is in the best interest of the minor child . . . to maintain the *status quo* by continuing the care, custody and control of the minor child with the Plaintiffs pending further hearings in the matter, and to allow for Defendant Covington's filing of responsive pleadings in this matter." This finding contradicts and supplants the trial court's prior oral finding that Mr. Covington was "unfit" because he was "homeless."

After the *ex parte* emergency custody order was entered, Ms. Cole visited with Tracy, attending around seven visitations in a two-month period. After the temporary custody order was entered, the parties reached a written visitation schedule they all consented to, as instructed by the trial court, which was filed with the trial court on 12 May 2015. Ms. Cole abided by the visitation schedule, but on 21 May 2015, the Dunns moved to suspend visitation, alleging that on 19 May 2015, Ms. Cole "was using a controlled substance and/or a narcotic while having visitation with the minor child at the Defendant's room at the extended stay motel at which she resides in Jacksonville, North Carolina." The Dunns also alleged that the Onslow County Department of Social Services ("DSS") "pursuant to a third party report, arrived at the Defendant's room and immediately escorted her to a drug test." The trial court entered an order on 11 June 2015 restricting Ms. Cole's time with Tracy to supervised visitation for two hours on Wednesdays weekly, basing the order on the "positive drug test," "[l]ack of cooperation with Carteret County DSS," and "[r]ecent discharge from the Port Program in Jacksonville, N.C."

Ms. Cole testified that, in early 2015, she was prescribed prescription opiates by a dentist to treat pain stemming from a procedure to treat tooth decay and she developed a dependency on the prescription opioid medication. She said that, at the end of January 2015, she sought help at Port Human Services ("Port"), a drug addiction rehabilitation hospital in Jacksonville, that included a Suboxone clinic. She

also testified she was attending classes at Port when the complaint in this case was filed. She testified she did not successfully complete the Suboxone program, but that she entered the program out of her own volition as "a way to get off prescription opiates . . . ." On cross-examination of Ms. Dunn, she conceded she had no evidence that Ms. Cole was abusing drugs at the time the Dunns filed the complaint. Ms. Cole also testified that, as part of the court-sanctioned visitation schedule, she had to submit to drug tests once a week, and she complied with those drug tests that showed she was only taking Adderall to treat Attention Deficit Disorder and the Suboxone prescribed by Port. At some point during Spring of 2015, Ms. Cole went from prescription opiates to heroin. DSS responded to a claim that Ms. Cole was using drugs while visiting with Tracy on 19 May 2015 and DSS required her to take a drug test. Statements from the trial court judge in the transcript indicate the urinalysis performed on Ms. Cole came back positive. Ms. Cole testified her drug addiction soon came to the attention of her parole officer and he had a conversation with her, after which he had her transferred back to Arizona and charged with a probation violation for the drug use. Ms. Cole was flown back to Arizona in August 2015.

In Arizona, Ms. Cole appeared before the district court on her probation violation and the court agreed to permit her to remain on probation if she completed treatment at The Meadows drug rehabilitation center in Wickenburg, Arizona. Ms. Cole subsequently spent forty-five days at The Meadows, successfully completing the

rehabilitation program on 11 November 2015. She then moved into Sober Living, a halfway house in Chandler, Arizona. Ms. Cole testified the halfway house was not the best environment because some residents were actively using drugs and she relapsed after about a week there. Ms. Cole moved into a motel where her probation officer visited her, determined that she had relapsed, and told her she needed to seek treatment or have her probation revoked.

Ms. Cole was initially sent to Chandler Valley Hope to detox, but subsequently entered the rehabilitation program at Desert Cove Rehabilitation Center on 15 or 16 December 2015 and stayed there for seven months, until the end of June 2016, successfully completing the rehabilitation program. Ms. Cole testified she had maintained her sobriety after graduating from the Desert Cove program and had been sober for eighteen months as of 13 June 2017.

After the trial court entered its 11 June 2015 order modifying Ms. Cole's visitation, Ms. Cole's parents, the Schweisthals, moved to intervene in the case on 12 June 2015. They also filed an answer and counterclaim seeking custody of Tracy. The trial court granted the Schweisthals' motion to intervene on 20 August 2015 *nunc pro tunc* for 12 May 2015. On 5 October 2015, the Dunns moved to dismiss the Schewisthals' counterclaim for failure to state a claim upon which relief can be granted and moved for appropriate relief for the trial court "to correct the 'nunc pro

tunc' date from May 12, 2015 to June 19, 2015 on the Order Allowing Intervention." The Dunns also replied to the Schweisthals' answer and counterclaim.

The Schweisthals filed an emergency motion for visitation on 9 November 2015, after Ms. Cole had been required to returned to Arizona and just prior to her successful graduation from the rehabilitation program at The Meadows. The trial court issued an order on 27 April 2016 holding the Schweisthal's motion in abeyance pending the appointment of and investigation by a guardian ad litem, Missy Blackerby ("the guardian ad litem"). The trial court entered an order setting a consent visitation schedule on 12 August 2016. In addition to telephone, FaceTime, or Skype contacts three times a week, the order provided for trips for Tracy to visit the Intervenors in Arizona in October 2016, December 2016, April 2017, and July 2017, as well as visitation any time the Schweisthals would be in North Carolina, provided they gave Plaintiffs thirty days advance notice. The visitation order also provided Ms. Cole five supervised telephone visits with Tracy per week, and that, after the fifth visit, if the supervisor determines they were appropriate, Ms. Cole could move to unsupervised telephone visits. After review of the supervisor's report by the guardian ad litem and Dr. Amy James ("Dr. James"), a counselor appointed for Tracy, Ms. Cole could move to supervised in-person visitation.

The Dunns took Tracy to Arizona to visit the Schweisthals for the agreed-upon October 2016 visitation, but the Dunns moved to suspend visitation on 8 December

2016. The trial court entered an *ex parte* order suspending the Schweisthals' visitation, adopting the allegations in the Plaintiffs' motion as findings of fact, including an allegation made by the guardian ad litem and the Dunns that the Schweisthals had retained an attorney and, on the December 2016 visit, intended to prevent Tracy from returning home and obtain an *ex parte* custody order from an Arizona court. However, in the order, the trial court noted the order "in no way adversely affects [Ms. Cole] in her future phone visitations and eventual visitation."

The Dunns moved to limit electronic communications between the Schweisthals and Tracy on 26 March 2017. Ms. Cole moved for review by the court and to expand her visitation on 12 April 2017. In the motion, Ms. Cole argued that, although she had complied with every requirement of the agreed-to visitation schedule, the report of her supervisor had not been accepted. The trial court found in an order regarding electronic communications and expert recommendations entered on 20 April 2017 that "[t]he past telephone calls of the [Schweisthals] have been, for the most part, distracting and over burdensome for the minor child" and that Tracy "actually does not wish to talk to [them] except on rare occasions." The trial court also found that Ms. Cole and Tracy "have positively interacted in their phone conversation" and that "[t]he minor child misses her mother, [Ms.] Cole." The trial court found that Ms. Dunn, who "[wa]s not an expert," believed the calls with Ms. Cole caused "some adverse residual effect [in Tracy] afterward" and that both the

Schweisthals and Ms. Cole should only be able to call Tracy every other week. The trial court limited the Schweisthals to calls every other week, but expanded Ms. Cole's visitation to permit unsupervised calls every other week and allowed the possibility of a supervised visit, based on the recommendations of the experts and advocates involved.

On 30 March 2017, the trial court entered an order peremptorily setting the case for trial on 12 June 2017, as "there are issues remaining to be heard regarding permanent custody." The trial court heard the trial on the merits in this case on 12 and 13 June 2017. Ms. Cole testified she was engaged to be married and employed in Arizona at two jobs: working as a behavioral health technician at a recovery center and as a phlebotomist at a doctor's office. She testified she would complete her federal probation in March 2018. Ms. Cole further testified she had been sober for eighteen months as of 13 June 2017, having successfully completed the program at Desert Cove, and testified she attended up to five Narcotics Anonymous meetings per week. Her testimony was corroborated by her sponsor in Narcotics Anonymous, Timoree Branson ("Ms. Branson"), who travelled with Ms. Cole to North Carolina to testify on her behalf.

Ms. Cole's counsel moved to dismiss the case for failure to state a claim, cited several precedents of our courts, and argued there was insufficient evidence to show Ms. Cole acted inconsistent with her constitutional rights. The trial court said it

would decide the motion to dismiss at the close of the hearing; however, the court did not rule on the motion. The trial court said it would issue an order by the following Friday and said "I can tell you whatever the Order is, it's going to be a temporary Order because I'm going to see how everybody does in the transition and the stability." The trial court did not issue a subsequent temporary custody order.

During the hearing, Ms. Cole also testified she had unsupervised calls with Tracy every other week and that she never misses a call, exercising her rights to the fullest extent permitted under the 20 April 2017 electronic communications order. She further testified she sent gifts and clothes to Tracy, but was "kind of walking on egg shells" because the guardian ad litem told her in an email "[she] was not allowed to say those gifts were from [her]." Ms. Cole testified that, in her conversations with Tracy, Tracy would refer to her as "mommy" and "Mama Courtney." In its electronic communications order, the trial court found—and no party challenges the finding— that Tracy and Ms. Cole "have positively interacted in their phone conversations" and that Tracy "misses her mother, the Defendant, [Ms.] Cole."

Ms. Cole filed a motion on 20 December 2017 for the Dunns to show cause why they should not be held in contempt for failure to abide by the trial court's 20 April 2017 electronic communications order. She alleged that, on 21 October 2017, she "placed her regularly bi-weekly call to the minor child at the regularly schedule time[,]" but "[t]here was no answer at the [Dunns'] home number or their cell phone

numbers[,]" and that "[a]fter a year of regularly scheduled telephone visitation, this was the first time she was not able to contact the [Dunns] to talk to her daughter." Ms. Cole alleged the Dunns had not answered any of Ms. Cole's regularly scheduled calls since that date and Ms. Dunn had blocked her phone number. The trial court entered a show cause order finding "[p]robable cause exists to believe that Plaintiffs are [] in contempt of Orders of this Court" and scheduled a contempt hearing for 29 January 2018. The Dunns responded to the motion to show cause alleging: Ms. Cole had not retained an appropriate licensed counselor to facilitate reunification with Tracy; Ms. Cole asked Tracy to call her "mother" and not Ms. Dunn; Ms. Cole and the Schweisthals had asked the police to conduct welfare checks on Tracy; Ms. Cole had mailed Tracy pictures for Tracy's birthday in October 2018; and Ms. Dunn "is the best person to determine what is harmful to the minor child."

On 29 January 2018, the date the trial court had set for the contempt hearing sought by Ms. Cole, the trial court entered a permanent custody order granting permanent custody of Tracy to the Dunns.[2] Ms. Cole filed her notice of appeal of the custody order on 22 February 2018.

## II. Analysis

Defendant argues three issues on appeal: (1) the trial court "erred by failing to require the Dunns to prove by clear and convincing evidence that [Ms.] Cole had 'not

---

[2] On 27 March 2018, the trial court found the Dunns were not in contempt of court and dismissed Ms. Cole's motion to show cause.

acted consistent with her constitutionally protected rights as a parent'"; (2) the trial court's "findings of fact do not support its conclusion of law that [Ms.] Cole 'forfeited her constitutionally protected right as a biological parent to have care, custody and control' of Tracy by clear, cogent and convincing evidence"; and (3) the trial court "erred by making Findings of Fact that were not supported by competent evidence, and in some situations were contradicted by the evidence." We hold the trial court erred by failing to require the movants to show by clear and convincing evidence that Ms. Cole forfeited her constitutionally-protected status as the biological parent of Tracy prior to applying the best interest of the child analysis. The trial court also made findings of fact that were not supported by competent evidence. Therefore, we vacate the custody order and remand the case to the trial court.

A. Analysis under *Petersen* and its progeny

Defendant argues the trial court "erred by failing to require the Plaintiffs to prove by clear and convincing evidence that [Ms.] Cole had 'not acted consistent with her constitutionally protected rights as a parent[.]" Specifically, Defendant argues the trial court erred in its oral findings and written order by not announcing the standard of proof it applied. Defendant also argues the trial court erred by not applying the proper standard of proof: clear and convincing evidence. Plaintiffs, in turn, argue the trial court is not required to announce the standard of proof it applies, so long as the findings are supported by evidence that satisfies the standard.

Furthermore, Plaintiffs argue, relying on a law professor's article, that "biology does not beget rights," and that the "best interest of the child" analysis should control, even where the parent is not shown to be unfit.

Following United States Supreme Court precedent, our Courts have long recognized "a natural parent's liberty interest in the companionship, custody, care, and control of his or her child" arising under the Fourteenth Amendment Due Process Clause. *Price v. Howard*, 346 N.C. 68, 74, 484 S.E.2d 528, 531 (1997); *see Troxel v. Granville*, 530 U.S. 57, 66, 147 L.Ed.2d 49, 57 (2000) (reaffirming a parent's fundamental right "to make decisions concerning the care, custody, and control" of the parent's children). In *Petersen v. Rogers*, 337 N.C. 397, 445 S.E.2d 901, our Supreme Court held that "absent a finding that parents (i) are unfit or (ii) have neglected the welfare of their children, the constitutionally-protected paramount right of parents to custody, care, and control of their child must prevail." *Petersen v. Rogers*, 337 N.C. 397, 403-04, 445 S.E.2d 901, 905 (1994). In so holding, our Supreme Court in *Petersen* "expressly disavowed" language to the contrary in *Best v. Best*, 81 N.C. App. 337, 344 S.E.2d 363 (1986), on which the *Petersen* plaintiffs relied to argue that the welfare of the child "is paramount to all common law preferential rights of the parents."[3] *Id.* Our Supreme Court in *Petersen* reasoned that the defendants'

_____

[3] The Plaintiffs' argument citing to a law professor's article for the proposition that "biology does not beget rights" is, therefore, not supported by North Carolina law; nor is their assertion that "North Carolina Courts have routinely deferred to the child's best interests in resolving custody disputes" when it comes to disputes between a natural parent and a non-parent third-party.

"paramount right" as natural parents "had to prevail" over the plaintiffs' position as unlawful adoptive parents of the child, where "there was no finding that [the] defendants had neglected their child's welfare in any way." *Id.* at 404, 447 N.C. at 905.

Our Supreme Court reaffirmed and extended its analysis of the rights of natural parents in *Price v. Howard.* In *Price*, the defendant was the natural mother who gave birth to the child at issue and had represented that the plaintiff was the father. *Id.* at 70-71, 484 S.E.2d at 529. However, when the plaintiff and defendant separated, the child remained with the plaintiff for six years. *Id.* at 71, 484 S.E.2d at 529-30. A court-ordered blood test established the plaintiff was not the child's natural father and thus was a non-parent third party. *Id.* In *Price,* the key issue was "whether, under the facts of th[e] case, the trial court was required to hold that [the] defendant's constitutionally protected interest in the companionship, custody, care and control of her child must prevail or whether the statutorily prescribed 'best interest of the child' test should have been applied to determine custody." *Id.* at 74, 484 S.E.2d at 531.

Our Supreme Court reaffirmed that a natural parent has a "liberty interest in the companionship, custody, care and control of his or her child[,]" *id.* at 74, 484 S.E.2d at 531, but it further noted that while a fit and suitable parent is "'entitled to the custody of his child, it is equally true that where fitness and suitability are absent

he loses this right.'" *Id.* at 75, 484 S.E.2d at 532 (quoting *Wilson v. Wilson*, 269 N.C. 676, 677, 153 S.E.2d 349, 351 (1967)). Our Supreme Court then adopted the following test for determining when the "best interest of the child" analysis could apply without infringing a natural parent's constitutional rights:

> A natural parent's constitutionally protected paramount interest in the companionship, custody, care, and control of his or her child is a counterpart of the parental responsibilities the parent has assumed and is based on a presumption that he or she will act in the best interest of the child. Therefore, the parent may no longer enjoy a paramount status if his or her conduct is inconsistent with this presumption or if he or she fails to shoulder the responsibilities that are attendant to rearing a child. If a natural parent's conduct has not been inconsistent with his or her constitutionally protected status, application of the "best interest of the child" standard in a custody dispute with a nonparent would offend the Due Process Clause. However, conduct inconsistent with the parent's protected status . . . would result in application of the "best interest of the child" test without offending the Due Process Clause. Unfitness, neglect, and abandonment clearly constitute conduct inconsistent with the protected status parents may enjoy. Other types of conduct, which must be viewed on a case-by-case basis, can also rise to this level so as to be inconsistent with the protected status of natural parents. Where such conduct is properly found by the trier of fact, based on evidence in the record, custody should be determined by the "best interest of the child" test mandated by statute.

*Id.* at 79, 484 S.E.2d at 534-35 (citations omitted). The Court reversed and remanded with instructions to remand to the trial court "for a determination of whether defendant's conduct was inconsistent with the constitutionally protected status of a

natural parent," *id.* at 84, 484 S.E.2d at 537, as the facts included "a period of voluntary nonparent custody rather than unfitness or neglect," *id.* at 82, 484 S.E.2d at 536.

In a subsequent case, *Adams v. Tessener*, 354 N.C. 57, 550 S.E.2d 499, our Supreme Court held that "a trial court's determination that a parent's conduct is inconsistent with his or her constitutionally protected status must be supported by clear and convincing evidence." *Adams v. Tessener*, 354 N.C. 57, 63, 550 S.E.2d 499, 503 (2001) (citing *Santofsky v. Kramer*, 455 U.S. 745, 747-48, 71 L.Ed.2d 599, 603 (1982)). However, the Court in *Adams* affirmed the trial court's conclusions of law and application of the "best interest of the child" standard on the record before it because the intervenor-natural father did not argue the trial court erred in its findings of fact, and the "evidence of the record constitutes clear and convincing proof that [the intervenor]'s conduct was inconsistent with his right to custody of the child." *Id.* at 66, 550 S.E.2d at 505.

In *David N. v. Jason N.*, 359 N.C. 303, 608 S.E.2d 751, our Supreme Court reversed and remanded a trial court judgment awarding custody to a non-parent over a natural parent and held that the trial court, in finding that the natural father of the child acted in a way inconsistent with his constitutionally-protected status, "failed to apply the clear and convincing evidence standard as set forth in *Adams* in making this determination[.]" *David N.*, 359 N.C. 303, 307, 608 S.E.2d 751, 754 (2005).

When read together, these cases

> protect a natural parent's paramount constitutional right
> to custody and control of his or her children. The Due
> Process Clause ensures that the government cannot
> unconstitutionally infringe upon a parent's paramount
> right to custody solely to obtain a better result for the child.
> As a result, the government may take a child away from
> his or her natural parent only upon a showing that the
> parent is unfit to have custody, or where the parent's
> conduct is inconsistent with his or her constitutionally
> protected status.

*Adams*, 354 N.C. at 62, 550 S.E.2d at 503 (citation omitted). In making the

determination that a natural parent is unfit or has otherwise acted in a manner

inconsistent with her constitutionally-protected status, the trial court must apply the

clear and convincing evidence standard. *David N.*, 359 N.C. at 307, 608 S.E.2d at

754. In a custody dispute between a natural parent and a non-parent third-party,

only after the trial court has determined by clear and convincing evidence that the

natural parent has lost her paramount right as a result of unfitness or acting in a

manner inconsistent with her constitutionally-protected status may the trial court

proceed to the "best interest of the child" analysis. As our Supreme Court

summarized in *Owenby v. Young*, 357 N.C. 142, 579 S.E.2d 264:

> [T]he Due Process Clause of the Fourteenth Amendment
> ensures that the government does not impermissibly
> infringe upon a natural parent's paramount right to
> custody solely to obtain a better result for the child. Until,
> and unless, the movant establishes by clear and convincing
> evidence that a natural parent's behavior, viewed
> cumulatively, has been inconsistent with his or her

protected status, the "best interest of the child" test is simply not implicated. In other words, the trial court may employ the "best interest of the child" test only when the movant first shows, by clear and convincing evidence, that the natural parent has forfeited her constitutionally protected status.

*Owenby*, 357 N.C. 142, 148, 579 S.E.2d 264, 268 (2003) (internal citations omitted).

In the present case, the trial court, in its conclusions of law in the permanent custody order, stated as follows:

> 2. It is in the best interest of the minor child to be in the permanent custody, care and control of the Plaintiffs.
> . . .
> 4. Also, based on the foregoing Findings of Fact the Court concludes that the Defendant Cole, based on her conduct, as set forth herein, has forfeited her Constitutionally protected right as a biological parent to have the care, custody and control [of] her minor child.

The trial court erred in applying the "best interest of the child" analysis to grant custody to the Dunns prior to determining whether Ms. Cole lost her paramount right by acting inconsistent with her constitutionally-protected status.

The trial court also failed to apply the clear and convincing evidence standard as set forth in *David N.* in making this determination, *David N.*, 359 N.C. at 307, 608 S.E.2d at 754, because it failed to state which standard of proof it used. "Clear and convincing evidence" is a higher evidentiary standard than the "greater weight of the evidence" standard used in ordinary child custody cases between natural parents where the "best interest of the child" is the sole test. *See Everette v. Collins*, 176 N.C.

App. 168, 173, 625 S.E.2d 796, 799 (2006). As the trial court did not state which standard it used, an appellate court cannot review the record to determine whether the trial court complied with this requirement. *Cf. In re Church*, 136 N.C. App. 654, 657, 525 S.E.2d 478, 480 (2000) (holding trial court erred in termination-of-parental-rights case when it failed to affirmatively state clear, cogent and convincing evidentiary standard because "without such an affirmative statement the appellate court is unable to determine if the proper standard of proof was utilized"); *accord David N.*, 359 N.C. at 307, 608 S.E.2d at 754 (reversing trial court order where it stated parent's conduct was "tantamount to abandonment, neglect, abuse or other acts inconsistent with [a] natural parent's constitutionally protected interest[,]" but did not state clear and convincing evidentiary standard).

The trial court also conflated the "best interest of the child" analysis with the independent and prior question of whether Ms. Cole, the natural parent, was unfit or acted inconsistent with her constitutionally-protected status. While "[u]nfitness, neglect, and abandonment clearly constitute conduct inconsistent with the protected status parents may enjoy[,]" other conduct "can also rise to this level" but "must be viewed on a case-by-case basis[.]" *Price*, 346 N.C. at 79, 484 S.E.2d at 534-35. Our Courts have long held that a parent's "socioeconomic status is irrelevant to a fitness determination." *Raynor v. Odom*, 124 N.C. App. 724, 731, 478 S.E.2d 655, 659 (1996) (citing *Jolly v. Queen*, 264 N.C. 711, 713-14, 142 S.E.2d 592, 595 (1965)). Indeed, in

*Jolly v. Queen*, our Supreme Court specifically contrasted the question of the relevance of socioeconomic status to a parent's fitness with its role in the "best interest of the child" standard. *See Jolly v. Queen*, 264 N.C. 711, 715, 142 S.E.2d 592, 596 (1965) ("Conceivably, a judge might find it to be in the best interest of a legitimate child of poor but honest, industrious parents . . . that his custody be given to a more affluent . . . relative who had no child and desired him. Such a finding, however, could not confer a right as against such parents who had not abandoned their child, even though they had permitted him to spend much time in the [relative]'s home.").

Socioeconomic factors that this Court has held do not show a parent's unfitness or acts inconsistent with constitutionally-protected status include the propriety of the parent's place of residence, that the parents move frequently, that their house at times lacked heat or was not cleaned regularly, their choice in spouse or babysitter, that the parent did not have relatives nearby to assist in caring for the child, a history of being unable to maintain stable employment, and loss of a job. *See Perdue v. Fuqua*, 195 N.C. App. 583, 587, 673 S.E.2d 145, 149 (2009); *Myers v. Myers*, 148 N.C. App. 716, 562 S.E.2d 117, 2002 WL 275956 at *8 (2002) (unpublished); *Penland v. Harris*, 135 N.C. App. 359, 363, 520 S.E.2d 105, 108 (1999); *Rhodes*, 14 N.C. App. at 408, 188 S.E.2d at 567. While socioeconomic factors such as the quality of a parent's residence, job history, or other aspects of their financial situation would be relevant

to the determination of whose custody is in the best interest of the child, those factors have no bearing on the question of fitness.

In the present case, the findings the trial court relied on to conclude Ms. Cole acted inconsistent with her constitutionally-protected status included that she was temporarily "homeless"; that she had "removed herself from the [Dunns'] home"; that she "not until recently, maintained gainful and continuous employment"; and that she previously "only worked sporadically." All of these are socioeconomic factors that may be relevant to a "best interest of the child" analysis but have no relevance to the preliminary question of whether Ms. Cole is unfit or has acted inconsistent with her constitutionally-protected status. The trial court also incorporated "all Findings of Fact in its previous orders to further bolster the issuance of [its permanent custody o]rder," but those factual findings in the original temporary custody order have the same defect. Indeed, the trial court's oral finding at the March 2015 temporary custody hearing focusing on Ms. Cole's lack of "a proper permanent residence for the child," as well as its finding that "she makes just enough money now to be able to afford to pay the hotel and that's it" shows that, from the beginning, the trial court improperly considered Ms. Cole's socioeconomic status in determining that she was unfit or had acted inconsistent with her constitutionally-protected status.

We hold the trial court failed to first determine whether Ms. Cole forfeited her paramount right before conducting a "best interest of the child" test, failed to

articulate the clear and convincing standard of evidence, and conflated the question of whether Ms. Cole acted inconsistent with her constitutionally-protected status with the "best interest of the child" test. As our Supreme Court held in *Owenby*, "the trial court may employ the 'best interest of the child' test only when the movant first shows, by clear and convincing evidence, that the natural parent has forfeited [] her constitutionally protected status." *Owenby*, 357 N.C. at 148, 579 S.E.2d at 268. In this case, the trial court conducted a "best interest of the child" analysis without requiring that constitutionally-mandated preliminary showing in both the March 2015 temporary custody order and the January 2018 permanent custody order on appeal and thus failed to protect Ms. Cole's paramount constitutional right to the custody and control of her child under the Due Process Clause.

B.  The Trial Court's Findings of Fact

The trial court also made findings of fact that are not supported by competent evidence.

> [W]e first note that in custody cases, the trial court sees the parties in person and listens to all the witnesses. This allows the trial court to "detect tenors, tones and flavors that are lost in the bare printed record read months later by appellate judges." Accordingly, the trial court's findings of fact "'are conclusive on appeal if there is evidence to support them, even though the evidence might sustain findings to the contrary.'"

*Adams*, 354 N.C. at 63, 550 S.E.2d at 503 (internal citations omitted). "Findings of fact made in the custody proceeding, when supported by competent evidence, are

conclusive on appeal." *In re Orr*, 254 N.C. 723, 726, 119 S.E.2d 880, 882 (1961) (citation omitted).

In the present case, the trial court made the following findings of fact in its 29 January 2018 permanent custody order that are challenged by Defendant:

> a. [Ms. Cole] abdicated her daily nurturing, daily care and all the necessary activities related to child-rearing of the minor child to the paternal grandparents, [the Dunns].
> b. Both the Defendants, [Mr.] Covington and [Ms.] Cole, were homeless in Arizona until taken in by the Plaintiffs in Emerald Isle, North Carolina in 2015. The Plaintiff's traveled to Arizona, returning to their residence with both Defendant's and the minor child after the Defendant Intervenors refused to allow them to reside in their residence in Arizona.
> c. The Defendant Cole, not until recently, maintained gainful and continuous employment and as of the date of this hearing and [(sic)] she was still on federal probation in Arizona for trafficking in firearms to Mexico, having been convicted in 2009.
> d. In early 2015, Defendant Cole removed herself from the Plaintiff's home and eventually the Plaintiff's [(sic)] evicted the Defendant Covington as he refused to leave voluntarily.
> e. As a result of the Onslow County Department of Social Services conducting an investigation in 2015, the minor child was removed from the care, custody and control of the mother, Courtney Cole, and was placed with the Plaintiffs.
> . . .
> j. Defendant testified she went to another detox facility December 2015 from which she was discharged in June 2016 and had been "clean" for seven (7) months as of the date of this hearing, June 2017. Defendant testified she would be on supervised probation until March, 2018. Also, as of the date of this hearing, [t]he Defendant has obtained a residence and now lives with her boyfriend whom she met in a drug rehabilitation facility.

The trial court also expressly incorporated the factual findings made in its previous orders in the permanent custody order at issue "to further bolster the issuance of this [o]rder[.]" In addition to the above challenged findings of fact, Defendant also challenged the following factual findings from the trial court's 19 March 2015 temporary custody order:

> 14. That during the time the Defendants resided with the Dunns, they did not assist with the daily care, feeding or clothing of their minor child, and said care was provided to the minor child by Plaintiff Karla Dunn.
> 15. The Defendants provided no monetary support for their minor child while living with the Plaintiffs, and said support for the minor child was provided by Plaintiffs alone.
> . . .
> 21. That Defendant Cole testified that she was asked to leave Plaintiffs' residence about mid February, 2015, as the Plaintiffs stated she had made little to no efforts to become employed.
> . . .
> 29. That neither Defendant sought assistance from any agency for housing, food or daycare.

After reviewing the record, we agree with Defendant and hold that none of the challenged statements are supported by competent evidence and are often contradicted by evidence in the record. As Defendant notes in her reply brief, Plaintiffs "cite no evidence, competent or otherwise, in either the transcript []or record to support any of the trial court's eight [] findings of fact identified by [Defendant] in her Brief." We consider the challenged statements in turn.

1. <u>Daily Care of Tracy</u>

In Finding of Fact 7(a), the trial court found that Ms. Cole "abdicated her daily nurturing, daily care and all the necessary activities related to child-rearing of [Tracy] to the [Dunns.]" However, Defendant argues that "it was uncontradicted that Tracy slept with [Ms. Cole] and [Mr. Covington] in the upstairs bedroom[,]" and, [a]s a result, [Ms. Cole] provided some daily care for Tracy, at a minimum putting her down to go to sleep and getting her up in the mornings." Plaintiffs, however, do not point to any particular competent evidence to support this factual finding.

Ms. Cole testified that, while living with the Dunns, she cared for Tracy on a daily basis when she did not work. She testified that, although she suffered from anxiety attacks in the mornings, "if someone from the Dunn family hadn't already made breakfast for [Tracy] [she] would make breakfast for her"; she would "let her play a little bit, watch cartoons, there would be times where [she]'d go out in the pool with [Tracy]"; she would "take her out on her little bike around the block"; and "ma[k]e sure she had snacks, lunch." Ms. Cole further testified that she, Tracy, and Mr. Covington slept in the same upstairs bedroom, and she would put Tracy to bed at night "[t]o the best of [her] ability," because "it was kind of hard to get Tracy to sleep."

Ms. Dunn testified on direct examination that "before [when Ms. Cole had custody of Tracy,] she stayed up in the bedroom a lot if they were there, if they could

keep up there." She also testified that, after Ms. Cole left the residence, Tracy did not sleep in her own room, but "she sleeps with . . . [Mr. Covington]." She also testified that, while Ms. Cole was living with the Dunns, Ms. Cole would feed Tracy breakfast around five times per month. Also, Plaintiffs' counsel at trial had Mr. Covington confirm that "[Ms. Cole's] interaction with the child was to take her in the room and have her go to sleep with her." After reviewing this evidence, we agree with Defendant that the evidence in the record does not support the trial court's factual finding that she "abdicated her daily nurturing, daily care and all the necessary activities related to child-rearing of [Tracy] to the [Dunns.]" At a minimum the uncontradicted evidence shows Ms. Cole put Tracy to bed and helped her get to sleep at night, which is a necessary activity in caring for a child, particularly since Tracy had trouble sleeping, and also that Ms. Cole would feed Tracy breakfast about five times per month. This finding is therefore not supported by competent evidence and is contradicted by evidence in the record.

2. Ms. Cole's financial assistance and government aid for Tracy

Finding of Fact 15 of the temporary custody order, which was incorporated by reference into the findings of fact of the permanent custody order, states "[t]hat the Defendants provided no monetary support for their minor child while living with the Plaintiffs, and said support for the minor child was provided by Plaintiffs alone." Also, in Finding of Fact 29 of the temporary custody order, similarly incorporated by

reference, the trial court states "[t]hat neither Defendant has sought assistance from any agency for housing, food or daycare."

Although the trial court found Defendants "said support for the minor child was provided by Plaintiffs alone[,]" Ms. Cole actually testified that the Dunns paid for everything regarding Tracy "except for food." This finding is therefore contradicted by the evidence. Moreover, Defendant argues in her brief "it was uncontradicted that [Ms. Cole] obtained an ADT (EBT or food stamps) card while in the Dunns['] home and that it was used for the benefit of Tracy." Although when asked on redirect examination "who pays the expenses for the child, while the child's been in your home[,]" Ms. Dunn said "[w]e pay for all of her stuff[,]" she then admitted "[Ms. Cole] got a ADT [(i.e., EBT)] card, I think for a few months and we used that to buy uhm, food for the house but that didn't buy diapers and the uhm, the baby stuff." Furthermore, in their brief, Plaintiffs do not point to any particular competent evidence that supports these challenged findings. Therefore, the trial court's findings that "Defendants provided no monetary support for their minor child while living with the Plaintiffs," and "that neither Defendant ha[d] sought assistance from any agency for housing, food or daycare[,]" are both contradicted by the evidence because, at a minimum, the record shows Ms. Cole provided for Tracy's food by acquiring an EBT card, which constitutes substantial financial support for the child.

3. Ms. Cole's Employment History

In Finding of Fact 7(c) of its permanent custody order, the trial court found that "[Ms. Cole], not until recently, maintained gainful and continuous employment[.]" Also, in its oral factual findings for the temporary custody order, the trial court found that "[Ms. Cole had] only recently become stably employed[,]" and, in paragraph 21 of the temporary custody order, the trial court found that "[Ms. Cole] had made little to no efforts to become employed[.]" Defendant argues in her brief that the record contradicts the trial court's statements because, during the seven months she lived with the Dunns, she had seven jobs; she had two jobs at the time of the temporary custody hearing in March 2015; and she had two jobs at the time of the permanent custody hearing in June 2017. Moreover, Defendant notes that Ms. Dunn "admitted that allegation 16 in her complaint, that [Ms. Cole] had made no effort to become gainfully employed, was not true[,]" and that "[i]f a plaintiff testifies that an allegation in her Complaint is not true, then it should be error for the trial [court] to find that allegation to be true and rely upon that allegation as a basis to deny [Ms. Cole] custody of Tracy."

The record shows that two weeks after Ms. Cole arrived in Emerald Isle in April 2014 to live with the Dunns, she got a job at Emerald Grill. She also worked with Mr. Covington cleaning beach condos during that time. Ms. Cole testified that she soon got frustrated with her employer taking money back from all the employees for shortages, even if particular employees were not responsible for them. She worked

at Emerald Grill for about two weeks and, as a result of her dissatisfaction, sought and obtained employment elsewhere after one or two weeks of searching. Ms. Cole obtained a job at Santorini's Grill and "liked it there for the most part[,] so [she] ended up staying there for a little bit." She worked there for about three months, from July to October 2014. Ms. Cole testified she left around Halloween and "tried finding jobs in medical positions, [and] didn't really have any luck because of [her prior criminal] background." She testified she got a job at an Urgent Care in Jacksonville around the end of December 2014. However, she testified at both the 9 March 2015 temporary custody hearing and the 13 June 2017 custody hearing that her work ended after two and a half weeks, when she learned there would be a background check and she informed her employer that she had a felony on her record and was on probation. She further testified that, just prior to the filing of the complaint in January 2015, she was first prescribed opiates by a dentist and sought treatment for her opioid dependency at Port.

Ms. Cole testified that, at the time of the temporary custody hearing on 9 March 2015, she was employed at two jobs. She "work[ed] three to four days a week [at Crystal Coast Retina Center] and then [she was] trying to make it where [she] work[ed] the rest of the days at Golden Corral."

At the time of the 13 June 2017 custody hearing, Ms. Cole testified she lived in Phoenix, Arizona, and worked two jobs: "at a rehab center at Fountain Hills

Recovery and . . . for a doctor's office as a Medical Assistant, Phlebotomist at Regenesis in Scottsdale[, Arizona.]" She testified she had her job at Fountain Hills Recovery since 4 January 2017 and it was a full-time job, working forty hours every week for $13.50 per hour. At the same time, she worked at the doctor's office as a medical assistant around thirty or thirty-five hours a week for $17 per hour. Ms. Cole testified she was working about seventy to seventy-five hours a week at the time of the 13 June 2017 custody hearing.

After reviewing the record and the transcripts, we find no competent evidence to support—and substantial evidence that contradicts—the trial court's Finding of Fact 7(c) that "[Ms. Cole], not until recently, maintained gainful and continuous employment[.]" The record clearly shows that Ms. Cole obtained gainful employment immediately upon moving to North Carolina and remained employed throughout her seven months living with the Dunns, despite some periods of unemployment between jobs. Moreover, during those periods between jobs, the record shows Ms. Cole actively looked for new employment and even sought more advanced and steady employment to the extent her circumstances as a person with a felony record permitted.

Plaintiffs do not cite to any competent evidence that supports the factual findings at issue. Instead, Plaintiffs argue that "[Ms. Cole's] idea of gainful employment was having several jobs in a short period of time while maintaining none of them for any length of time." Merriam-Webster's defines "gainful" as "productive

of gain: profitable." *Gainful*, Merriam Webster's New Collegiate Dictionary 511 (11th ed. 2003). Leaving a job that, as Ms. Cole testified, is withholding money owed is itself "productive of gain" if it leads to obtaining more remunerative employment, such as Ms. Cole's move from one restaurant to another and is leaving a job in the food service industry to pursue a career in a medical field, as Ms. Cole did in seeking and obtaining the Urgent Care job after having worked in a restaurant for three months. Neither the trial court nor Plaintiffs cite any case supporting a holding that working *too many* jobs supports a finding that a parent is unfit or has acted inconsistent with their constitutionally-protected status. While Ms. Cole may not have had the opportunities available to others, such as Plaintiffs, particularly as a collateral consequence of her felony conviction, our Courts have held such socioeconomic factors are not relevant to finding that a parent has acted inconsistent with their constitutionally-protected status.

We further note that the trial court dismissed as irrelevant the two jobs Ms. Cole was working at the time of the March 2015 temporary custody hearing at Crystal Coast Retina Center and Golden Corral by making the oral finding that "[Ms. Cole had] only recently become stably employed." Similarly, the trial court wrongly dismissed the two demanding jobs Ms. Cole was working for seventy or more hours a week at the time of the June 2017 custody hearing and her over five months of full-time employment leading up to that hearing by finding "[Ms. Cole], *not until recently*,

maintained gainful and continuous employment[.]" In both instances, Ms. Cole's employment at the time of the hearing contradicts the trial court's primary factual finding and the trial court cannot ignore competent contradictory evidence by merely discounting it. For these reasons, the trial court's factual findings that "[Ms. Cole], not until recently, maintained gainful and continuous employment[,]" and "[Ms. Cole had] only recently become stably employed[,]" are not supported by competent evidence and contradicted in the record.

The trial court's finding in the 2015 temporary custody order that "[Ms. Cole] had made little to no efforts to become employed[,]" is also not supported by competent evidence and contradicted by evidence in the record. The Plaintiffs made the following allegation in their original complaint, which was discussed at the 25 March 2015 temporary custody hearing: "The Plaintiffs are preparing to evict [Ms.] Cole because she has made no effort to become gainfully employed or to substantially participate in the care of her daughter." After reading this allegation in court, Ms. Dunn admitted it was untrue on cross-examination because, as Ms. Dunn testified, "[Ms. Cole] was making an effort to be gainfully employed." Ms. Dunn's admission directly contradicts the trial court's factual finding and no other competent evidence supports this finding; indeed, the record shows Ms. Cole has made and continues to make efforts to find and maintain gainful employment, even maintaining multiple jobs. Therefore, the trial court's findings regarding Ms. Cole's employment history

are not supported by competent evidence and contradicted by evidence in the record. The trial court erred in relying on Ms. Cole's employment history in finding she was unfit.

4.  The finding that Ms. Cole had been "homeless" and her housing history

In Finding of Fact 7(b) of the permanent custody order, the trial court found that "[b]oth the Defendants, [Mr.] Covington and [Ms.] Cole, were homeless in Arizona until taken in by the Plaintiffs in Emerald Isle, North Carolina in 2015." In its oral findings for the temporary custody order hearing, the trial court stated "[s]he, in the Court's opinion, is still basically homeless because she still lives in a hotel room at a Main Stay Suites[.]" Counsel for Ms. Cole challenged the trial court's description of Ms. Cole's living situation, but the trial court persisted, saying she was homeless because she lacked "a proper permanent residence for the child" and that "[the trial court] considers her homeless. People living in hotel rooms whether they're Extended Stays with suites or not, in my opinion, are homeless." The trial court further orally characterized 'homelessness' in addressing Mr. Covington's fitness in the temporary custody order hearing:

> Mr. Covington, the way I think, I find you're unfit is because you're homeless. You live with your parents at their, what would I say, if they told you to go, you'd have to go, so basically you're homeless. And you know, I sympathize with you. You know, I can't put a child in the street.

Merriam-Webster's defines "homeless" as "having no home or permanent place of residence" and "home" as "one's place of residence: domicile[.]" *Homeless*, *home*, Merriam-Webster's New Collegiate Dictionary 594 (11th ed. 2003). Also, the McKinney-Vento Homeless Assistance Act ("the Act"), 42 U.S.C. § 11301 *et seq.*, defines "homeless" as an "individual or family who lacks a fixed, regular, and adequate nighttime residence[.]" 42 U.S.C. § 11302(a)(1) (2015). The record shows that Defendants did "reside" overnight with Tracy in the extended-stay motel for a month; however, an extended-stay motel is "fixed, regular, and adequate" and is clearly meant for human habitation and Defendants were therefore not homeless under that definition. Another definition in the Act is "an individual or family who . . . will imminently lose their housing, including . . . rooms in hotels or motels not paid for by [government assistance programs,]" as evidenced by "the individual or family having a primary nighttime residence that is a room in a hotel or motel and where they lack the resources necessary to reside there for more than 14 days"; "has no subsequent residence identified" and "lacks the resources or support networks needed to obtain other permanent housing." *Id.* § 11302(5)(A)-(C). However, the evidence shows Defendants were able to pay for their own stay for a month and that Ms. Cole and Tracy (although not Mr. Covington) had the "support network[]" in the Schweisthals to obtain a subsequent permanent residence in their home. Moreover, the Defendants, including Mr. Covington, had support from the Dunns through their

offer to move into their residence in North Carolina. Therefore, at no time was Ms. Cole "homeless," either in an ordinary sense or as defined by our federal statutes. That she chose to live with the Dunns, who would ultimately seek to evict her, over her own parents for the sake of Mr. Covington does not mean that she was ever "homeless," particularly since she had subsequent housing after eviction from the Dunns with her friend from the restaurant and, later, in a motel which she paid for herself, and during which time she still had the support of her parents. We hold this finding of fact was not supported by competent evidence and was contradicted by evidence in the record. The trial court erred in relying on Ms. Cole's housing history in finding she was unfit.

5. The finding that Ms. Cole "removed herself" from Plaintiffs' home

In Finding of Fact 7(d) of the permanent custody order, the trial court found that Ms. Cole "removed herself from the Plaintiff's home . . . ." Defendant challenges this finding and argues that, contrary to Ms. Cole "removing herself" from the Dunns' house, "[i]t was uncontradicted at trial that the Dunns did not tell [Ms. Cole] to get out of their house, until after they had received an *ex parte* temporary custody order for Tracy. [Ms. Cole] was told to get out of the Dunns' house, the same day the Dunns' complaint and ex parte temporary custody order were served on her." We agree with Defendant. The evidence shows the Dunns evicted Ms. Cole after filing the complaint stating their plan to evict her and asking her to leave. There is no evidence to suggest

that leaving the Dunns' residence and her daughter was Ms. Cole's choice. This finding is not supported by competent evidence.

6. The Length of Ms. Cole's Sobriety

Finding of Fact 7(j) of the trial court's permanent custody order states that "[Ms. Cole] had been 'clean' for seven [] months as of the date of this hearing, June, 2017." However, Defendant argues this finding is contradicted by evidence in the record, because Ms. Cole testified she had been clean and sober for 18 months as of June 2017. Her testimony was corroborated by her Narcotics Anonymous sponsor and no evidence was offered to contradict this testimony. We agree. Ms. Cole testified she "actually ha[d] eighteen months today" on 13 June 2017. We note she testified she was sober for seven months while in the Desert Cove recovery program, but she then testified she was sober for nearly a year after completing the program. Thus all competent evidence in the record shows Ms. Cole was sober for 18 months as of 13 June 2017, not the seven months found by the trial court. This finding was not supported by competent evidence. We note that, given the multiple factual findings relating to Ms. Cole's prior drug use, the court inappropriately discounts her sobriety by minimizing its duration in comparison.

7. The finding that Ms. Cole was convicted of "trafficking firearms to Mexico"

In Finding of Fact 7(c) of the permanent custody order, the trial court found "as of the date of this hearing and [(sic)] she was still on federal probation in Arizona

for trafficking in firearms to Mexico, having been convicted in 2009." Ms. Cole contends this finding is not supported by competent evidence because "[Ms. Cole] testified that she had been convicted in federal court in Arizona of conspiring to sell firearms without a license, and there was no evidence offered to contradict this." After reviewing the record, we agree. The evidence shows Ms. Cole was convicted of conspiracy to sell firearms without a license and no other offense. The trial court's mislabeling of the offense is not supported by competent evidence. We further note that, at the time the order issued on 29 January 2018, Ms. Cole only had just over a month of federal probation remaining.

8. The findings that Ms. Cole "had no face to face contact with [Tracy] in two years"

Finally, in Finding of Fact 11 of the permanent custody order, the trial court states "as of the date of this hearing [Ms. Cole] has had no face to face contact with [Tracy] in two (2) years." Also, in Finding of Fact 13, it states "Dr. James testified the minor child suffers from severe 'Reactive Attachment Disorder' as a result of having no contact with the biological mother in two (2) years . . . ." Defendant does not challenge the veracity of these findings, but instead argues "it was not the fault of [Ms. Cole], and should not be used as grounds for awarding permanent custody of Tracy to the Dunns." Defendant cites numerous instances where her contact with Tracy was restricted not by her own choice or based on neglect, but by the actions of Plaintiffs and the orders of the trial court. Although Defendant's arguments

regarding these particular factual findings are couched as challenges based on lack of competent evidence, Defendant essentially argues that the factual findings that she has not seen her daughter face-to-face for two years does not support the legal conclusion that she has acted inconsistent with her parental rights. We agree.

In early 2015, the Dunns filed their complaint and the trial court gave emergency and then temporary custody of Tracy to the Dunns. During that time, Ms. Cole visited with Tracy frequently. In June 2015, her in-person visitation was restricted by the trial court after her positive drug test. Just as Ms. Cole was about to graduate from The Meadows drug rehabilitation program in Arizona, the Schweisthals moved for expanded visitation and the court established a visitation schedule that included four opportunities for in-person visitation with Ms. Cole and the Schweisthals in October 2016, December 2016, April 2017, and July 2017. Tracy did visit Ms. Cole and the Schweisthals for the October 2016 trip. However, the Dunns soon sought, and the trial court chose to grant, an *ex parte* emergency order canceling the December 2016 trip and future in-person visitation to Arizona on the bare allegation by the guardian ad litem that the Schweisthals would seek to keep Tracy in Arizona. Subsequently, the trial court instructed the Dunns to work with the experts and arrange in-person visitation with Ms. Cole and the Schweisthals while they were in North Carolina for the 12 June 2017 hearing. They did not do so.

The record shows Ms. Cole, on her own initiative, sought and obtained expanded FaceTime and Skype visitation in the 20 April 2017 electronic communications order approved by the trial court. The record shows Ms. Cole complied with all the requirements of that order, and took every opportunity to have contact with Tracy. However, beginning on 21 October 2017, the Dunns unilaterally stopped taking her calls as required by the order and Ms Dunn blocked Ms. Cole's phone number, ending all communication between Ms. Cole and Tracy. Ms. Cole filed her motion to show cause and, in the Dunns' reply, they stated that Ms. Dunn "is the best person to determine what is harmful to the minor child." At the 29 January 2018 show cause hearing, Ms. Dunn testified she made the decision to stop the phone calls with Ms. Cole. Although, during the hearing, the trial court made a last-minute effort to contact a therapist for a supervised in-person visitation, the therapist replied to the Dunns' counsel by phone that she did not have time to prepare.

The record shows that Ms. Cole exercised her rights for in-person visitation and to communicate with and develop her relationship with Tracy to the greatest extent permitted. That she has been unable to visit her daughter in-person in two years is attributable to the actions of the Dunns and the order of the trial court, with which she has fully complied. "When examining a legal parent's conduct to determine whether it is inconsistent with his or her constitutionally-protected status, . . . the gravamen of 'inconsistent acts' is the *volitional* acts of the legal parent that relinquish

otherwise exclusive parental authority to a third party." *Mason v. Dwinnell*, 190 N.C. App. 209, 228, 660 S.E.2d 58, 70 (2008) (emphasis added). In these circumstance, Ms. Cole's inability to see her daughter face-to-face for two years did not show volition on her part. To hold that Ms. Cole is unfit because she has not seen her daughter in-person in two years under these circumstances would be, as the trial court characterized this portion of its own order at the contempt hearing, "a catch 22 situation." We hold her inability to see or communicate with her daughter does not support a finding that Ms. Cole was unfit or acted inconsistent with her constitutionally-protected status.

## III. Conclusion

In the permanent custody order on appeal before us, as well as the original temporary custody order, the trial court failed to determine whether Ms. Cole forfeited her paramount right by acting inconsistent with her constitutionally-protected status prior to applying the "best interest of the child" analysis. In both orders, the trial court conflated the "best interest of the child" analysis with the separate analysis of Ms. Cole's constitutional status under *Petersen* and its progeny. It also failed to articulate and apply the "clear and convincing" standard of proof required by *David N.* We also hold that many of the trial court's factual findings are not supported by competent evidence or do not support a finding that Ms. Cole acted inconsistent with her constitutionally-protected status. Therefore, we vacate the

permanent custody order granting custody to the Dunns in its entirety. We remand this case to the trial court with instructions to enter a new permanent custody order and first conduct the proper constitutional analysis, consistent with this opinion and the precedents of our courts, employing the "best interest of the child" test only if the movant first establishes, by clear and convincing evidence, that Ms. Cole acted inconsistent with her constitutionally-protected status as Tracy's natural parent.

Undoubtedly, Ms. Cole was in a precarious position in 2015 when she chose to take the Dunns' offer and move her family from an extended-stay motel in Arizona to the Dunns' residence in Emerald Isle and, once there, took multiple jobs that paid little money. Her felon status made obtaining work more difficult and becoming dependent on opioids compounded her problems. However, her situation was primarily based on socioeconomic factors our courts have long held are irrelevant to the question of a natural parent's fitness. Despite substantial positive changes in Ms. Cole's life in the intervening years, the trial court found in its permanent custody order that Ms. Cole had acted inconsistent with her constitutionally-protected status while conflating the "best interest of the child" standard with the question of whether she was unfit or acted inconsistent with her constitutionally-protected status, failing to apply a clear and convincing standard of proof, and relying on factual findings not supported by competent evidence. We vacate the trial court's permanent custody

order awarding custody to the Dunns and remand for proceedings consistent with this opinion.

VACATED AND REMANDED.

Judges COLLINS and HAMPSON concur.